UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
DOREEN RIVERS,                           **MEMORANDUM & ORDER**
                                         13-CV-4147 (KAM)
                    Plaintiff,

-against-                                **Not for publication**

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

                    Defendants.
---------------------------------X

**MATSUMOTO**, **United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff Doreen

Rivers ("plaintiff") appeals the final decision of defendant

Commissioner of Social Security Carolyn Colvin ("defendant"

or the "Commissioner") that plaintiff is not eligible for

Supplemental Security Income ("SSI") pursuant to the Social

Security Act ("the Act").  Presently before the court are the

parties' cross-motions for judgment on the pleadings.  For

the reasons set forth below, the court denies both the

plaintiff's and defendant's motions and remands this case for

further proceedings consistent with this opinion.

<u>**BACKGROUND**</u>

I. <u>Procedural History</u>

        Plaintiff filed for SSI on August 16, 2007,

alleging disability as of January 1, 2007 due to anxiety

panic attacks, depression, and back, head and knee pain.

(Tr.[1] 100; 195-99; 226-27.)  On September 11, 2008, the

Social Security Administration ("SSA") denied plaintiff's

application.  (Tr. 122-25.)  Plaintiff requested a hearing,

and on November 3, 2009, she appeared with counsel at a

hearing before Administrative Law Judge ("ALJ") Jerome

Hornblass.  (Tr. 41-58.)  ALJ Hornblass denied plaintiff's

application December 2, 2009, and thereafter plaintiff filed

a request for Appeals Council review.  (Tr. 102-15; 15-16.)

On March 14, 2011, the Appeals Council vacated ALJ

Hornblass' December 2, 2009 decision and remanded the case

for additional proceedings.  (Tr. 116-20.)  The Appeals

Council found that the ALJ failed to adequately evaluate the

opinion of the treating physician, Mohamed Elessawy, M.D.,

("Dr. Elessawy") and did not address the treating physician

opinion from Santapuri D. Rao, M.D. ("Dr. Rao").  (*Id.*)  The

Appeals Council also found that the ALJ failed to consider

additional medical evidence in the record, specifically

therapy treatment notes covering the period from May 14, 2007

through October 9, 2009 and physical therapy treatment notes

covering the period from August 28, 2007 through August 10,

2009.  (*Id.*)

On February 29, 2012, plaintiff appeared with

counsel at a remand hearing before ALJ Moises Penalver.  (Tr.

---

[1] "Tr." refers to the administrative record and the corresponding pages.

59-99.)  Vocational expert Peter Manzi also testified at the request of the ALJ.  (*Id.*)  By decision dated May 25, 2012, ALJ Penalver found that plaintiff was not disabled.  (Tr. 17-31.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 17, 2013.  (Tr. 1-7.)  The instant action followed.

II.  Plaintiff's Background and Non-Medical Evidence

        Plaintiff was born on June 10, 1963.  (Tr. 195.) Plaintiff attended school through the tenth grade.  (Tr. 232.)  Plaintiff states that she was not able to finish high school and pass the GED due to concentration problems.  (Tr. 66, 371.)  Plaintiff reported that she had worked as a maintenance worker in the Parks Department in 2003.  (Tr. 227.)  Since 2003, plaintiff has been working part-time as a retail sales associate.  (Tr. 245-47, 253-62.) Plaintiff reported that, as a sales associate, she would greet customers, show merchandise, and operate the cash register. (Tr. 228.)  Plaintiff reported working 4 hours per day for three days per week in 2008, which was reduced to four hours per day one day per week in 2012.  (Tr. 66, 245-47.) Plaintiff stated that she was required to work to receive public assistance (commonly referred to as "workfare").  (Tr. 47, 50.)

In an undated Disability Report, plaintiff reported that she suffers from anxiety, panic attacks, depression, and back, head, and knee pain. (Tr. 226.) Plaintiff also reported that her ex-husband is abusive and stalks her, which causes her to be "very anxious and tense." (Tr. 227.) Plaintiff also reported that she cannot travel outside of Staten Island due to extreme pain and anxiety. (Tr. 233.) In a Disability Report dated September 27, 2007, the claims administrator noted that plaintiff "obviously had anxiety and nervousness" and that she had to stand up a few times during the interview due to back pain. (Tr. 236.)

In a function report dated February 5, 2008, plaintiff indicated that she lived in an apartment with her three teenage children. (Tr. 263-64.) Plaintiff reported that her day consisted of making breakfast and eating, getting her children up for school, resting and taking her medicine, cooking dinner, and resting again. (Tr. 364.) She prepared meals daily. (Tr. 265.) Plaintiff performs housework consisting of "a little" dusting, washing dishes, and light sweeping. (Tr. 266.) Plaintiff reported that she could go out alone and drove a car when traveling. (*Id.*) She shopped for food and household items either in stores, by phone, or by mail. (Tr. 267.) She shopped for fifteen minutes twice a week. (*Id.*) Her hobbies consisted of

4

reading and watching television. (*Id.*) In the summer, she spent a few days a week relaxing at the beach, sitting in the sun, or sitting in the park. (*Id.*) Plaintiff reported that she cannot sit nor walk for a long time, which affects her activities. (*Id.*) Plaintiff's social activities consisted of talking and going to dinner. (Tr. 268.) Plaintiff reported difficulties with lifting, standing, walking, sitting, climbing stairs, and kneeling. (*Id.*) Plaintiff reported that she was able to walk one-half of a block before needing to rest for three to five minutes. (Tr. 269.) Her ability to sleep was affected by back, knee, and leg pain and headaches. (Tr. 264.) Plaintiff indicated that she could finish tasks that she starts, and was able to follow both spoken and written instructions. (Tr. 269.)

Plaintiff testified at the hearing held on November 3, 2009, that she lived in a second story apartment with her three children. (Tr. 44.) Plaintiff also testified that she occasionally experiences panic attacks when driving in traffic and sometimes turns off the road and "get[s] confused." (Tr. 51.) Plaintiff stated that she experiences back and shoulder pain. (Tr. 55.) Plaintiff testified that she was limited to walking for less than one block due to pain and cannot sit for more than half an hour without getting up. (*Id.*)

At the hearing conducted on February 29, 2012, plaintiff testified that she lived with her two children ages 18 and 20. (Tr. 63.) Plaintiff stated that she drove a few times a week, when she "really need[ed] to drive." (Tr. 64.) Plaintiff testified that she had a long history of back pain, which has worsened over time and led to reduction in the number of hours she is able to work. (Tr. 68-73.) Plaintiff also testified that she experienced pain in her neck, shoulders, upper back, fingers, and feet. (*Id*.) Plaintiff also had migraine headaches, three to four days per week, typically lasting several hours and sometimes overnight. (Tr. 78-80.)

III. Plaintiff's Medical History

A. *Physical Impairments*

The record reflects that plaintiff saw Suo-Maw Chou, M.D. ("Dr. Chou") since July 1997, for upper respiratory infections, gastrointestinal complaints, anxiety, headaches, and musculoskeletal complaints. (*See* Tr. 584-629.)

On October 10, 1998, plaintiff presented to Dr. Chou with low back and hip pain, stating that she was involved in a motor vehicle accident on September 28, 1998. (Tr. 611.) Plaintiff also stated that she had pain in the side of her chest and in her shoulders. (*Id*.) On November 2, 1998, plaintiff complained of low back pain radiating to the

6

right leg.  (Tr. 612.)  X-rays of plaintiff's lumbosacral
spine taken that day revealed slight straightening of the
normal lumbar lordosis, but were otherwise unremarkable.  (Tr.
670.)  X-rays of plaintiff's pelvis were normal.  (Tr. 677.)

Plaintiff stated that she still had low back pain
when seen on March 18, 1999.  (Tr. 610.)  An MRI of the
lumbosacral spine performed on May 7, 1999 revealed a minimal
diffuse disc bulge at L4-L5.  (Tr. 673, 676.)  On July 12th
and July 24th, plaintiff had appointments with Dr. Chou and
continued to complain of low back pain.  (Tr. 608, 609.)  Dr.
Chou prescribed Norflex and Celebrex on July 24, 1999.  (Tr.
608.)  On February 7, 2000, plaintiff presented with low back
pain in both hips, and Dr. Chou also prescribed Norflex and
Celebrex.  (Tr. 607.)  On July 18, 2000, Dr. Chou prescribed
Celebrex and Tylenol.  (Tr. 618.)  At an appointment with Dr.
Chou on July 25, 2000, plaintiff complained of low back pain.
(Tr. 619.)

On February 27, 2003, plaintiff was seen by Dr.
Chou for chronic anxiety with palpitations.  (Tr. 605.)  Dr.
Chou prescribed Xanax.  (*Id.*)  On December 17, 2004,
plaintiff complained of chronic anxiety and lumbosacral pain;
Celebrex and Mobic were prescribed.  (Tr. 599-600.)  On April
4, 2005, plaintiff presented with complaints of anxiety, on
and off palpations, low back pain, and pain in both knees.

(Tr. 598.) Dr. Chou prescribed Mobic and Ultracet. (*Id.*)
On October 18, 2005, plaintiff stated that she had right knee
pain and problems with her knee locking. (Tr. 595.) On
January 10, 2006, plaintiff met with Dr. Chou and complained
of headaches and was prescribed Fioricet and Motrin. (Tr.
593, 629.) Dr. Chou also prescribed these medications on
August 25, 2006. (Tr. 588-89.)

On January 19, 2007, plaintiff complained of off
and on epigastric pain, off and on headaches, anxiety, and
panic attacks. (Tr. 584.) Dr. Chou prescribed Paxil and
Fioricet. (*Id.*) On March 20, 2007, Dr. Chou noted
plaintiff's complaints of low back and knee pain and
prescribed Motrin and Xanax. (*Id.*) On May 24, 2007, Dr.
Chou made a note that plaintiff had an "anxiety panic attack."
(Tr. 586.)

On August 23 and 24, 2007, plaintiff was evaluated
at Richmond University Medical Center ("RUMC") for complaints
of chest pain and persistent headache. (Tr. 293, 300-06,
391-98.) Cardiac enzymes and an electrocardiogram (EKG) were
normal. (Tr. 306, 396-97.) Testing did not suggest cardiac
ischemia. (Tr. 305, 396.) On August 24, 207, plaintiff had
no chest pain, but indicated she had a headache. (*Id.*) Upon
discharge, atypical chest pain and tension headache were

8

diagnosed. (Tr. 293.) Plaintiff was prescribed Nexium,
Ativan, and Xanax. (*Id.*)

On August 28, 2007, plaintiff related to Dr. Chou
that she had been evaluated at the hospital with chest pain
and anxiety. (Tr. 582-83.) Plaintiff complained of
generalized joint pain, pain in both knees, and low back pain.
(*Id.*) Dr. Chou prescribed Ativan and Elavil. (*Id.*)

On August 28, 2007, plaintiff met with Dr. Elessawy
of Staten Island Rehabilitation Medicine, P.C. via a referral
from Dr. Chou for evaluation of long-standing low back pain,
which had recently worsened. (Tr. 282, 527, 660; *see* Tr.
287-89, 564-65.) Plaintiff complained of low back and leg
pain aggravated by standing, walking, laying down, and
sitting for prolonged periods. (Tr. 282.) Plaintiff rated
her pain as 8 on a scale from 1 to 10. (*Id.*) Plaintiff
denied numbness or tingling. (*Id.*) On examination,
plaintiff was able to stand, walk to the examination table
and sit. (*Id.*) Dr. Elessawy found her gait was within
normal limits, motor strength was 4+/5 in both upper and
lower extremities, active range of motion was within normal
function in all extremities, and straight leg raising was
negative bilaterally. (*Id.*) Dr. Elessawy noted that
plaintiff had multiple trigger points in the shoulders, upper
back, both elbows, knees, and hips, and sensation and deep

tendon reflexes were within normal function. (*Id.*) Dr. Elessawy diagnosed fibromyalgia and prescribed amitriptyline and physical therapy twice a week. (*Id.*)

Aftercare instructions from RUMC dated September 25, 2007 indicate that plaintiff was treated for anxiety and stress reactions. (Tr. 290-91.)

On October 26, 2007, plaintiff saw Dr. Chou, who diagnosed plaintiff with anxiety and panic disorder, generalized pain, and abnormal menstruation. (Tr. 580-81.) Plaintiff was prescribed Xanax, Klonopin, Lexapro, and Cymbalta and was told to discontinue Ativan, Elavil, and Motrin. (Tr. 581.)

On October 30, 2007, plaintiff presented to Dr. Elessawy with depression and anxiety as well as pain and aching all over her body. (Tr. 286, 563.) Plaintiff stated that she was having family and job problems. (*Id.*) A physical examination revealed full (5/5) muscle strength. (*Id.*) Dr. Elessawy noted tender points in the shoulders and legs. (*Id.*) Dr. Elessawy recommended continued use of Elavil and rehabilitation twice a week for four to six weeks. (*Id.*)

Plaintiff saw Dr. Chou on November 29, 2007 with complaints of back pain. (Tr. 617.) Dr. Chou prescribed Mobic, Lexapro, and Topanex. (*Id.*)

On December 4, 2007, plaintiff saw Dr. Elessawy for continued back and hip pain, which she rated at a pain level of five out of ten. (Tr. 562.) Plaintiff noted that physical therapy helped to some extent. (*Id.*) Dr. Elessawy's examination revealed tenderness over her back and hip. (*Id.*) Dr. Elessawy prescribed Naproxen and continued physical therapy. (*Id.*; Tr. 546.)

Mahendra K. Misra, M.D. ("Dr. Misra") conducted a consultative physical examination of plaintiff on December 11, 2007. (Tr. 339-44.) Plaintiff stated that she has been suffering from back pain for six years and that the pain was worsening. (Tr. 339.) Plaintiff described the pain as constant and radiating to both hips and rated the pain at nine on a scale of one to ten. (*Id.*) Plaintiff also described feeling numbness and tingling in her feet. (*Id.*) Dr. Misra noted that plaintiff drove to the examination. (Tr. 340.) Plaintiff reported that she did not sleep well and was only able to stand for a few minutes at a time and could sit for fifteen minutes before becoming restless. (*Id.*) Plaintiff reported that she could walk about half a block at a time before needing to stop and could carry less than five pounds. (*Id.*) Plaintiff told Dr. Misra that she does light cleaning, laundry, cooking and shopping with the help of her children. (*Id.*)

Upon examination, Dr. Misra noted that plaintiff had good finger dexterity and grip strength was 4/5 bilaterally. (Tr. 341.) Dr. Misra noted that plaintiff was able to do heel-toe walking. (*Id.*) Plaintiff also managed "some" heel walking and some toe walking but could not squat. (*Id.*) Plaintiff's posture was erect and she had no difficulty getting on and off the examination table. (*Id.*) Dr. Misra found that plaintiff's deep tendon reflexes in both upper and lower extremities were normal and equal. (*Id.*) There was no evidence of any motor or sensory loss. (*Id.*) Dr. Misra noted that the movement of plaintiff's cervical spine was unimpaired and her upper limbs had full range of motion, but that her thoracolumbar movements were restricted. (*Id.*) Straight leg raising was "only" 30 degrees bilaterally, and other joint movements were normal. (*Id.*) There was evidence of lumbosacral paravertebral muscle spasm and no muscle atrophy. (*Id.*) Dr. Misra diagnosed possible lumbosacral discogenic disease with radiculopathy. (Tr. 342.) She opined that plaintiff could perform work that does not require lifting too much weight or involve a lot of bending, climbing, lifting, pushing, or pulling. (*Id.*) Dr. Misra noted that his evaluation was based on his physical findings and he had no medical reports available for review. (*Id.*)

Plaintiff was seen by Dr. Elessawy on March 31, 2008, and she presented with back and neck pain, as well as complaints of lack of sleep and weight loss due to anxiety. (Tr. 560-61.) Plaintiff reported pain at the level of seven or eight on a scale between one and ten. (Tr. 560.) Dr. Elessawy's examination revealed bilateral trigger point tenderness of the shoulders, neck, trapezoids, and mid-back. (Tr. 560.) Dr. Elessawy diagnosed fibromyalgia, and prescribed Amitriptyline and Ambien, as well as continued physical therapy. (Tr. 561.) Dr. Elessawy also examined plaintiff on July 11, 2008 and noted bilateral trigger point tenderness in the shoulders, neck, trapezoids, and mid-back. (Tr. 558-59.) Dr. Elessawy prescribed Amitriptyline and Ambien in addition to continued physical therapy. (Tr. 559.) On August 24, 2008, plaintiff presented with continuing back and bilateral sacroiliac joint pain, which she reported at a level of five out of ten. (Tr. 557.) Dr. Elessawy instructed plaintiff to continue physical therapy and medications (Amitriptyline, Ambien, and Motrin). (*Id.*)

Lamberto Flores, M.D. ("Dr. Flores") conducted a consultative physical examination on August 22, 2008. (Tr. 405-09.) Plaintiff stated that she had a history of head, neck, chest, back, and knee pain of approximately five years' duration, which she stated was diagnosed as fibromyalgia.

(Tr. 406.) Plaintiff reported that she cannot tolerate prolonged sitting lasting more than ten to fifteen minutes without knee and back pain and cannot lift more than five to ten pounds. (*Id.*) Plaintiff stated that she drove to the examination and lived in a second-floor apartment with one flight of stairs. (*Id.*)

Upon examination, Dr. Flores found plaintiff's posture and gait to be normal. (Tr. 408.) She was able to do tandem and toe and heel walking. (*Id.*) Plaintiff had no difficulty getting on and off the examination table. (*Id.*) Although the examination revealed no spinal neck tenderness, plaintiff had limited range of motion; flexion and extension was 10 degrees and rotation was 20 degrees. (Tr. 407.) Dr. Flores noted that plaintiff exhibited shoulder tenderness and her range of motion was limited on forward flexion to 70 degrees. (Tr. 408.) Examination of the lumbosacral spine revealed no scoliosis, but there was tenderness at the L2 to L4 area. (*Id.*) Range of motion on straight leg raising was limited to 40 degrees. (*Id.*) Bending was limited to 70 degrees. (*Id.*) There was no evidence of muscle spasm or sensory loss. (*Id.*) Dr. Flores assessed that plaintiff had full muscle strength at 5/5. (*Id.*) Dr. Flores diagnosed a history of fibromyalgia. (Tr. 408.) He opined that plaintiff was limited with respect to raising both shoulders

above the head, neck flexion, extension and rotation due to symptomatology and that she was limited for prolonged walking, sitting, standing, climbing stairs, and heavy lifting. (*Id.*)

On October 24, 2008, plaintiff saw Dr. Elessawy for continued pain reporting a pain level of four out of ten, but noted improvement. (Tr. 556.) She reported that she was having trouble sleeping. (*Id.*) Dr. Elessawy prescribed continued physical therapy and Lyrica and Amitriptyline. (*Id.*)

On February 20, 2009, plaintiff returned to Dr. Elessawy with a new referral for reevaluation of back pain that began two weeks earlier. (Tr. 554-55.) Plaintiff reported pain at level seven on a scale of one to ten and her pain was accompanied by numbness in the right leg and buttocks. (*Id.*) Dr. Elessawy's examination revealed paraspinal muscle tenderness of the upper and lower back and bilateral sacroiliac joint tenderness. (Tr. 555.) Dr. Elessawy noted that plaintiff's lumbar range of motion was within normal limits, reflexes were +2 in all extremities, and muscle strength was 5/5 in both lower extremities. (*Id.*) Dr. Elessawy prescribed Lyrica and provided a new order for physical therapy. (*Id.*)

On April 20, 2009 plaintiff saw Dr. Elessawy and complained of continuing right sacroiliac joint and low back

pain.  (Tr. 553.)  On examination, Dr. Elessawy found right
sacroiliac joint tenderness.  (*Id.*)  Dr. Elessawy prescribed
Lyrica, Naproxen, and continued physical therapy.  (*Id.*)  On
June 1, 2009 plaintiff complained of on and off right-sided
low back pain.  (Tr. 552.)  Dr. Elessawy prescribed continued
physical therapy and Mobic.  (*Id.*)

On June 29, 2009, plaintiff presented to the RUMC
emergency room complaining of a headache and chest pain that
had lasted all day; both were relieved with medication given
upon arrival.  (Tr. 640-43.)  Plaintiff was diagnosed with
atypical chest pain and anxiety.  (Tr. 643.)

On August 10, 2009, plaintiff presented to Dr.
Elessawy with complaints of right upper back pain; she
reported a pain level of eight out of ten.  (Tr. 551.)
Examination revealed trigger point tenderness in her right
upper back.  (*Id.*)  Plaintiff's range of motion was within
normal limits; muscle strength was 5/5; sensation and
neurological examination were within normal limits.  (*Id.*)
Dr. Elessawy prescribed Percocet and Flexeril and instructed
plaintiff to continue physical therapy.  (*Id.*)

In a letter dated September 25, 2009, Dr. Elessawy
wrote that he was treating plaintiff for fibromyalgia and low
back pain and that plaintiff had received outpatient physical
therapy with significant gains.  (Tr. 526.)

Dr. Elessawy completed a fibromyalgia questionnaire on October 29, 2009. (Tr. 436-41.) Dr. Elessawy reported that he saw plaintiff once every four to six weeks and diagnosed low back pain and sacroiliac dysfunction. (Tr. 436.) Dr. Elessawy's clinical findings consisted of multiple tender points over the shoulders, back, and hips. (*Id.*) Plaintiff's symptoms consisted of: multiple tender points; nonrestorative sleep; chronic fatigue; morning stiffness; muscle weakness; frequent, severe headaches; numbness and tingling; anxiety; panic attacks; depression; premenstrual syndrome; temporomandibular joint dysfunction; and chronic fatigue syndrome. (Tr. 436-37.) Plaintiff identified pain bilaterally in the following areas: lumbosacral spine, thoracic spine, shoulders, arms, hips, legs, and knees/ankles/feet. (Tr. 437.) Dr. Elessawy opined that emotional factors contributed to plaintiff's symptoms and limitations. (*Id.*) Plaintiff described having aching pain at level eight out of ten all the time. (*Id.*) Dr. Elessawy identified the following factors that precipitate pain: changing weather, fatigue, cold, stress, hormonal changes, and maintaining a static position. (*Id.*)

Dr. Elessawy indicated that plaintiff's pain or other symptoms would frequently interfere with her attention and concentration to perform even simple jobs, and that

17

plaintiff was incapable of even "low stress" jobs. (Tr.
438.) Dr. Elessawy stated that plaintiff's pain medication
caused dizziness and drowsiness. (*Id.*) Dr. Elessawy opined
that plaintiff could walk one block without rest or severe
pain, sit continuously for 20 minutes before needing to get
up, stand for 20 to 30 minutes at one time before needing to
sit down or walk around, and lift and carry less than ten
pounds. (Tr. 438-39.) Dr. Elessawy stated that plaintiff was
limited to working four hours per day. (Tr. 438.) Dr.
Elessawy opined that plaintiff needs to walk approximately
every 45 minutes for 10 minutes at a time and needs a job
which permits shifting positions at will from sitting,
standing or walking. (Tr. 439.) Dr. Elessawy reported that
plaintiff might require up to two unscheduled breaks during a
workday and on average would be absent from work about two
days per month due to her impairment. (Tr. 439-40.) Dr.
Elessawy opined that plaintiff could rarely twist, stoop
(bend), crouch, and climb. (Tr. 440.) Dr. Elessawy noted
that plaintiff has significant limitations in doing
repetitive reaching, handing, or fingering. (Tr. 440.) Dr.
Elessawy also opined that plaintiff could perform activities
requiring use of her arms and gross and fine manipulation
with her hands and fingers 50% of an eight-hour day. (*Id.*)

Dr. Elessawy also opined that plaintiff's impairments are likely to produce "good days" and "bad days." (*Id.*)

Plaintiff was seen by Stephen Kulick, M.D. ("Dr. Kulick") for complaints of headaches on September 7, 2011. (Tr. 685.) Plaintiff related having a longstanding history of migraines, which had recently become more severe and frequent. (*Id.*) Dr. Kulick diagnosed migraine syndrome and recommended that plaintiff undergo an MRI of the brain to exclude an AV malformation. (*Id.*) Dr. Kulick also prescribed Topamax and Relpax. (*Id.*) The MRI performed on September 28, 2011 yielded normal results with one isolated, nonspecific white matter T2-weighted hyperintensity in the right parietal region. (Tr. 686-87.) Marissa Maurino, a physician's assistant, and Dr. Kulick, advised plaintiff to increase her use of Topamax to twice a day and to start using Imitrex. (Tr. 687.) Plaintiff returned to Ms. Maurino and Dr. Kulick on November 2, 2011 and stated that Topamax and Imitrex were not effective to stopping her headaches. (Tr. 688.) Ms. Maurino and Dr. Kulick decided to place plaintiff on a trial for Treximet. (*Id.*) On January 18, 2012, plaintiff stated that Treximet made her feel sick and she stopped using it. (Tr. 689.) Ms. Maurino and Dr. Kulick prescribed a low-dosage of Fioricet, which plaintiff had previously tried but disliked the side effects at a higher

dosage. (*Id.*) On February 15, 2012, plaintiff reported
doing much better since resuming Fioricet. (Tr. 690, 692-93).

B. *Psychiatric Impairments*

On September 27, 2006, plaintiff was evaluated by
Simcha Goldberg, a social worker at the RUMC Behavioral
Health Service Division. (Tr. 308-15, 322-29). Plaintiff's
primary complaints were crying, chest pains, and difficulty
with breathing. (Tr. 309.) Plaintiff reported having
serious relationship problems with her ex-husband who she
described as controlling and had poor relationships with her
children from her first marriage, precipitating anxiety and
depression. (*Id.*) Plaintiff stated that she was growing
increasingly phobic and was having panicked reactions when
riding the Staten Island Ferry. (*Id.*)

On mental status examination, Mr. Goldberg found
plaintiff cooperative, and showing good eye contact and
normal motor activity. (Tr. 311.) Plaintiff spoke normally
at a regular rate of speech. (*Id.*) Plaintiff spelled "EARTH"
backwards with difficulty. (*Id.*) Out of three objects,
plaintiff could repeat two immediately. (*Id.*) Mr. Goldberg
assessed plaintiff's long term memory as good, her fund of
knowledge as fair, and her intelligence as average. (*Id.*)
Plaintiff's thought process was coherent. (*Id.*) Plaintiff
denied delusions and hallucinations, but reported that she

had a phobia of going over bridges and travelling on ferries
or trains. (*Id.*) Plaintiff's mood was depressed and anxious.
(*Id.*) Plaintiff's affect was full range. (*Id.*) Mr.
Goldberg diagnosed anxiety disorder, not otherwise specified
("NOS"), and depressive disorder, NOS. (*Id.*) Mr. Goldberg
noted that plaintiff was multi-phobic and had relationship
issues. (*Id.*) Mr. Goldberg rated plaintiff's Global
Assessment Scale ("GAF") as 59. (Tr. 311.) In a treatment
plan dated October 5, 2006, Michele Gunning, M.D. ("Dr.
Gunning") assessed plaintiff's GAF as 57 and recommended
medication management with a doctor, and individual therapy
with a social worker weekly for three months. (Tr. 319-20,
333-34.)

On May 4, 2007, Kathy Kaiser, a social worker at
RUMC, conducted a behavioral health assessment. (Tr. 366-72,
489-95.) Plaintiff reported being overwhelmed by her
appointments, her job, having to move, and maintaining her
public assistance benefits. (Tr. 366.) Plaintiff stated
that she was unable to take the ferry or go over bridges, and
had attacks that consisted of hysteria, palpitations,
shortness of breath, shaking, crying, feeling the need to
flee, and feeling as though she was dying. (*Id.*) Plaintiff
reported problems at work due to frequent headaches and
arriving late. (*Id.*) Plaintiff stated that she is

overwhelmed by financial stressors, which makes her want to
reunite with her second husband. (*Id.*)

On mental status examination, Ms. Kaiser reported that
plaintiff was cooperative and showed good eye contact and
normal motor activity. (Tr. 368.) Plaintiff's speech was
normal and she spoke at a regular rate. (*Id.*) Plaintiff was
unable to spell the word "EARTH" backwards. (*Id.*) Plaintiff
could repeat three objects immediately and none after five
minutes. (*Id.*) Ms. Kaiser found plaintiff's long term
memory and fund of knowledge were fair. (*Id.*) Her
intelligence was average. (*Id.*) Plaintiff denied delusions
and hallucinations. (*Id.*) Plaintiff reported that she had
phobias related to bridges and ferries. (*Id.*) Plaintiff
reported feelings of hopelessness. (Tr. 369.) She denied
suicidal and homicidal ideation. (*Id.*) Plaintiff's mood was
depressed and anxious. (*Id.*) Her affect was full range.
(*Id.*) Plaintiff's insight and judgment were fair. (*Id.*)
Plaintiff stated that she has problems at work due to her
anxiety and migraines. (Tr. 371.) Ms. Kaiser diagnosed
anxiety disorder, NOS, and rated plaintiff's GAF as 55. (*Id.*)

Danielle V. Harte, a social worker assessed
plaintiff on May 14, 2007, and the assessment was reviewed by
Dr. Gunning. (Tr. 499-506.) Plaintiff's chief complaints
were depression and anxiety. (*Id.*) Plaintiff's mental

status examination was essentially the same as the May 4, 2007 assessment. (*Id.*) Ms. Harte diagnosed depressive disorder, NOS, and anxiety disorder, NOS, and plaintiff's GAF was rated at 55. (*Id.*) On May 14, 2007, plaintiff also began psychotherapy with Ms. Harte, who noted that plaintiff's prior case had been closed due to noncompliance. (Tr. 449.) Ms. Harte treated plaintiff approximately weekly until October 9, 2009. (Tr. 449-88.) On May 18, 2007, Ms. Harte noted that plaintiff stated that she needed to find a new place to live and that she wanted to get back together with her ex-husband for financial support. (*Id.*)

On May 29, 2007, plaintiff saw Dr. Gunning for medication management. (Tr. 449-50.) Plaintiff stated that she had been unable to travel off Staten Island or go over bridges and discussed stressors on her relationships. (Tr. 450.) Dr. Gunning noted that plaintiff had been working at the mall and had no problems driving there. (*Id.*) Plaintiff reported fair sleep and appetite. (*Id.*) Plaintiff presented with good eye contact. (*Id.*) Her mood was anxious and affect was appropriate. (*Id.*) Plaintiff's speech was within normal limits and no abnormal movements were noted. (*Id.*) Plaintiff denied suicidal/homicidal ideation and auditory or visual hallucinations. (*Id.*) Dr. Gunning noted that plaintiff's thought process was goal-directed and her thought

content was coherent and relevant.  (*Id.*)  Plaintiff's memory and cognitive function were intact.  (*Id.*)  Plaintiff had fair insight, judgment, and impulse control.  (*Id.*)  Dr. Gunning diagnosed anxiety disorder, NOS, and depressive disorder, NOS.  (*Id.*)  Dr. Gunning rated plaintiff's GAF as 60.  (*Id.*)  Dr. Gunning prescribed Cymbalta and Atarax. (*Id.*)

Ms. Harte and Dr. Gunning noted in a June 5, 2007 treatment plan that plaintiff's GAF was 55.  (Tr. 379.)  Ms. Harte and Dr. Gunning recommended monthly medication management with Dr. Gunning and weekly individual psychotherapy with Ms. Harte.  (Tr. 380.)  Between June and August 2007, Ms. Harte's notes from psychotherapy sessions indicate that plaintiff was generally in a good mood, expressed anxiety and fear of leaving Staten Island, and discussed her relationships.  (Tr. 450-56.)  Plaintiff was evicted during this period, which she discussed with Ms. Harte.  (*Id.*)  Plaintiff generally did not take her prescribed medications.  (*Id.*)  On August 17, 2007, Ms. Harte reported that plaintiff presented trembling with anxiety and suggested that she go to the emergency room or fill her prescription from Dr. Gunning for Cymbalta.  (Tr. 455.)  In a psychotherapy session on August 29, 2007, plaintiff reported that she was admitted into RUMC on August 23, 2007 for chest

24

pain due to anxiety and was given Xanax and Ativan at the
hospital.  (Tr. 455.)  Plaintiff also discussed with Ms.
Harte obtaining an order of protection against her ex-husband.
(Tr. 456.)

On September 12, 2007, plaintiff saw Dr. Gunning
for medication management.  (Tr. 456-57.)  Plaintiff reported
feeling anxious and upset and having a decreased appetite due
to problems with her boyfriend.  (*Id*.)  Plaintiff's mental
examination was otherwise normal, and Dr. Gunning prescribed
continued use of Elavil and Ativan.  (*Id*.)  At an October 2,
2007 therapy session with Ms. Harte, plaintiff reported that
she had filed for an order of protection.  (Tr. 458.)

On October 8, 2007, Ms. Harte and Dr. Gunning
completed a treatment plan update that rated plaintiff's GAF
as 56 and noted that plaintiff had improved treatment
compliance and had made several trips over a bridge in the
preceding three months.  (Tr. 377.)  The treatment plan
recommended continued monthly medication management with Dr.
Gunning and weekly individual psychotherapy with Ms. Harte
and added a biweekly women's group for anxiety and depression.
(Tr. 378.)  At her first group therapy session on October 15,
2007, plaintiff rated her anxiety at nine out of ten and
depression at three out of ten.  (Tr. 459.)  Plaintiff
explained that she was anxious, because she was going to be

evicted in six days and just received a notice stating that her public assistance was being drastically decreased.  (*Id.*)

At a therapy session with Ms. Harte on October 23, 2007, plaintiff reported feeling sick, dizzy, and weak and noted that she was considering quitting her job because "she just can't do it (work) anymore."  (*Id.*)  Plaintiff rated her anxiety at six out of ten and depression at three out of ten at her group therapy session on October 29, 2007.  (Tr. 460.) At a group therapy session on November 12, 2007, plaintiff rated her anxiety at five out of ten and her depression at seven out of ten and noted that she was granted an extension for her eviction.  (Tr. 461.)

On December 11, 2007, Desilva, M.D. ("Dr. Desilva") conducted a psychiatric examination.  (Tr. 335-38.) Plaintiff drove herself to the examination and came alone. (*Id.*)  Plaintiff's chief complaints included chronic back pain, hip pain, and pain in the lower limbs which made her depressed and anxious and anxiety about her recent eviction. (*Id.*)  Plaintiff reported that her symptoms were worsening. (*Id.*)  Plaintiff stated that she had sleep disturbance, had lost about ten pounds, and was phobic and panicky about crossing bridges.  (*Id.*) Plaintiff had been working in retail, and was working one to two days per week at the time the report was completed.  (*Id.*)  She stated that work was

problematic because it required standing for long periods of time. (*Id.*) Plaintiff stated that her ability to cook and clean were limited because of pain and that she could only do limited shopping, because she could not lift or carry any weight. (*Id.*) She reported that she could perform her activities of daily living, could drive, and had friends. (*Id.*)

On mental status examination, the report noted that plaintiff appeared thin and asthenic and that her speech was spontaneous and coherent. (Tr. 336.) The report found evidence of paranoia but no evidence of delusions, and plaintiff denied auditory or visual hallucinations. (*Id.*) Plaintiff stated that she had some passive ideas about not wanting to live, but that she had no intent or plan, and denied homicidal ideations. (*Id.*) Plaintiff's mood was depressed and anxious, and the report described plaintiff as "panicky". (*Id.*) The report found that plaintiff was phobic about crossing bridges. (*Id.*) Plaintiff's affect was full. (*Id.*) Plaintiff's immediate, short term, and long term memory were "okay." (Tr. 337.) Plaintiff stated that her attention span and concentration were reduced due to chronic pain. (*Id.*) Plaintiff was unable to do serial seven calculations. (*Id.*) Plaintiff's abstract thinking was concrete, her intellectual functioning was average, and her

insight and judgment were fair.  (*Id.*)  Dr. Desilva diagnosed
major depressive disorder, recurrent, without psychotic
features.  (Tr. 337.)  Dr. Desilva recommended continued
outpatient psychiatric treatment and medication and continued
psychiatric counseling.  (Tr. 338.)

On December 28, 2007, plaintiff had an individual
therapy session with Ms. Harte, and she reported that she had
been depressed, crying, and not motivated since December 24,
2007.  (Tr. 464.)  Plaintiff also reported that she found an
apartment for her and her children.  (*Id.*)  At a group
therapy session on January 28, 2008, plaintiff rated her
anxiety moderate and her depression low, but discussed her
"constant struggle to survive."  (Tr. 466.)

On February 26, 2008, plaintiff saw Dr. Gunning for
medication management.  (Tr. 467.)  Upon mental examination,
plaintiff's signs were normal and consistent with past
examinations, with the exception that her affect was noted to
be "congruent" as opposed to "appropriate" in the past.
(*Id.*)  Plaintiff missed numerous group and individual therapy
sessions in March and April of 2008.  (Tr. 468-70.)  In the
two sessions she attended, plaintiff demonstrated a good mood
and discussed her relationships with Ms. Hart.  (*Id.*)
Plaintiff was removed from her group therapy due to her
failure to attend the sessions.  (Tr. 470.)

On May 7, 2008, plaintiff reported to Ms. Harte that the New York City Administration for Children's Services had opened up a case against her due to her children's delinquency from school. (Tr. 470.) On May 14, 2007, plaintiff reported that she obtained a second job which would increase her financial independence. (Tr. 471.)

On July 18, 2008, Diana Havill, M.D. ("Dr. Havill") examined plaintiff. (Tr. 473.) Plaintiff stated that her mood was "alright," and Dr. Havill noted that she had a slightly anxious affect. (*Id.*) Plaintiff reported problems with anxiety, panic attacks, and difficulties crossing bridges and traveling. (*Id.*) She denied any serious feelings of depression, except with respect to not being able travel off Staten Island with her children due to her anxiety. (*Id.*) Upon mental status examination, plaintiff had good eye contact, her speech was normal, thought process was coherent and goal oriented, cognition and memory were good, no abnormal movements were detected, and her insight and judgment were fair. (*Id.*) Dr. Havill's diagnosis was panic disorder with concurrent anxiety and discrete panic episodes, severely limiting mobility. (Tr. 474.) She prescribed Cymbalta and Klonopin. (*Id.*)

Sudharam Idupuganti, M.D. ("Dr. Idupuganti") conducted a consultative psychiatric examination on August 22,

2008. (Tr. 399-403.) Plaintiff arrived at the examination unaccompanied, having driven ten minutes to the examination. (Tr. 399.) Plaintiff stated that she could drive locally, but had panic attacks when she was in unfamiliar surroundings. (*Id.*) Plaintiff described her panic attacks, which last for several minutes at a time, as consisting of "strange feelings", palpitations, sweating, tremors, crying, and negative self-narration. (*Id.*) Plaintiff's primary complaints were anxiety, panic, and depression. (Tr. 400.) Plaintiff reported that, she had been unable to drive on bridges, through tunnels, or in unfamiliar surroundings for six years. (*Id.*) She stated that she could not take buses or be in crowded places. (*Id.*) Plaintiff reported that she reads and takes care of her children's needs and is able to cook, clean, and shop by herself. (*Id.*)

Upon mental status examination, plaintiff presented as pleasant and cooperative and answered questions openly and willingly. (Tr. 401.) She was anxious and tearful at times. (*Id.*) Plaintiff's speech was coherent and relevant. (*Id.*) Plaintiff spoke rapidly due to anxiety, and the tone and intensity of her voice were increased. (*Id.*) Plaintiff's speech was of normal productivity and exhibited no speech deviations. (*Id.*) Plaintiff's thought processes were logical and goal-directed. (*Id.*) Dr. Idupuganti detected no

process disorder and noted that plaintiff had no delusions, hallucinations or suicidal or homicidal ideation. (*Id.*) Dr. Idupanti noted that plaintiff's mood was anxious, but found no evidence of sustained or significant depression, manic episodes, or cyclical mood changes. (*Id.*) Plaintiff's affect was appropriate to her mood and her thought content was of normal range and intensity. (*Id.*) Plaintiff had good remote memory functions and was able to recall her date of birth, address, and Social Security number. (Tr. 402.) Dr. Idupanti found plaintiff's recent memory functions were within normal limits and noted that she was able to recall three objects within five minutes. (*Id.*) Plaintiff's auditory digit span was normal with a recall of seven digits forward and a reversal of four. (*Id.*) Plaintiff was able to do calculations. (*Id.*) Plaintiff's attention and concentration were within normal limits. (*Id.*) Dr. Idupuganti estimated that plaintiff had average intellectual skills. (*Id.*) Plaintiff's general knowledge and fund of information were within normal limits. (*Id.*) She was able to recall the president's and mayor's names and current events. (*Id.*) Dr. Idupuganti found plaintiff's abstract thinking capacity was normal--she was able to interpret proverbs and similarities and was able to calculate serial sevens. (*Id.*) Plaintiff had good insight into her condition,

and her social judgment skills were within normal limits.
(*Id.*)

Dr. Idupuganti diagnosed agoraphobia with panic
attacks. (Tr. 403.) He advised that plaintiff's complaints
were consistent with the findings on the examination. (*Id.*)
Dr. Idupuganti opined that plaintiff's ability to interact
with others in a social and routine work situation was intact
despite her frequent panic attacks. (*Id.*) Dr. Idupuganti
felt that plaintiff's dosage of Xanax was insufficient and
recommended that she receive more appropriate and intensive
medication management in addition to psychotherapy. (*Id.*)
Dr. Idupuganti opined that plaintiff's anxiety symptoms were
likely to improve with treatment. (*Id.*)

Dr. E. Gagan, a State agency psychiatric consultant,
reviewed the medical evidence of record and completed a
psychiatric review technique form on August 29, 2008. (Tr.
411-24.) Dr. Gagan concluded that plaintiff's impairments
did not meet the criteria of sections 12.04 (Affective
Disorders) or 12.06 (Anxiety-Related Disorders) of the
Listing of Impairments. (Tr. 411, 414, 416.) With respect
to the "B" criteria of the Listing of Impairments, Dr. Gagan
opined that plaintiff had mild restrictions maintaining
social functioning and moderate restrictions of activities of
daily living and maintaining concentration, persistence, or

pace. (Tr. 421.) Plaintiff had one or two repeated episodes of deterioration. (*Id.*)

Dr. Gagan also assessed plaintiff's mental residual functional capacity after reviewing plaintiff's medical file. (Tr. 425-28.) Dr. Gagan determined that plaintiff had moderate restrictions with the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to respond appropriately to changes in the work setting, and the ability to travel in unfamiliar places or use public transportation. (*Id.*) Otherwise, Dr. Gagan found that plaintiff was not significantly limited in her mental functionality. (*Id.*)

On February 26, 2009, plaintiff was examined by Albert Galante, M.D. ("Mr. Galante"). (Tr. 480.) Plaintiff reported that her anxiety had worsened since her daughter's boyfriend was "jumped." (*Id.*) Dr. Galante commented that plaintiff appeared to be drug seeking, and would monitor her usage. (*Id.*) Dr. Galante diagnosed panic disorder concurrently with anxiety and discrete panic episodes severely limiting mobility. (*Id.*) Dr. Galante discontinued Cymbalta and Klonopin and prescribed Paxil. (Tr. 481.)

Plaintiff missed her medical and psychotherapy appointments at RUMC between April 14, 2009 and June 2, 2009 and Ms. Harte noted that plaintiff's case would be closed on July 7, 2009 due to noncompliance for ninety days. (Tr. 483.) Plaintiff returned to therapy on June 19, 2009 and was in a good mood and discussed relationships with Ms. Harte. (*Id.*) Plaintiff reported to a psychotherapy session on June 23, 2009 with Ms. Harte and was in a depressed and tearful but stable mood. (Tr. 483-84.) Plaintiff discussed moving to Michigan where she can live more affordably and have the support of family. (*Id.*) Plaintiff reported to her therapy session on July 6, 2009 in a depressed, angry and tearful mood but exhibited stability. (Tr. 484.)

On October 9, 2009, plaintiff saw Santapuri Rao, M.D. ("Dr. Rao") for medication management. (Tr. 488.) Dr, Rao noted that plaintiff had not been seen by a psychiatrist since February 2009. (*Id.*) Plaintiff reported that her primary care physician was prescribing Xanax, which she took, as needed, for panic symptoms. (*Id.*) Plaintiff stated that she drove on Staten Island, and at times felt so panicky in traffic that she took a Xanax when she got home. (*Id.*) Plaintiff stated that she avoided going on the ferry, train, or buses, or traveling in the car with her family out of

Staten Island.  (*Id.*)  Plaintiff was directed to continue using Xanax, as needed.  (*Id.*)

Dr. Rao and Ms. Harte completed a psychiatric impairment questionnaire dated October 28, 2009.  (Tr. 442-46.)  The questionnaire reported that plaintiff's treatment began in May 2007 and was ongoing.  (Tr. 442.) Plaintiff's diagnoses were depressive disorder, NOS, and anxiety disorder, NOS.  (*Id.*)  Plaintiff's GAF was rated at 58.  (*Id.*)  The questionnaire noted that plaintiff had fears related to traveling and that financial instability and interpersonal relationships were main stressors.  (*Id.*)  Plaintiff had a poor memory, issues with cognition and concentration, and showed signs of claustrophobia.  (Tr. 442-43.)  The questionnaire noted that plaintiff showed decreased pace and efficiency in completing tasks and had panic attacks.  (Tr. 443.)  Treatment consisted of weekly therapy and medication management, specifically noting Xanax.  (*Id.*)  The questionnaire noted that plaintiff's reported symptoms were credible and were expected given the objective medical findings and that the impairment can be expected to last at least twelve months.  (*Id.*)  Plaintiff's prognosis was that her impairment was long-term but could improve with regular medication and therapy and improvement in finances and stable relationships.  (*Id.*)

The questionnaire further reported that plaintiff had marked difficulty with housecleaning and maintenance of a residence, shopping and handling money, paying bills on time, using public transportation, initiating and participating in activities independently, and keeping appointments. (Tr. 444.) Plaintiff also reportedly had marked difficulties getting along with family members, making and getting along with friends, getting along with others, showing consideration for others, holding a job and avoiding being fired, avoiding altercations, and avoiding eviction. (*Id.*) The report indicated that plaintiff experienced deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner and that plaintiff would experience repeated episodes of deterioration or decompensation in a work or work-like setting. (Tr. 445.)

## DISCUSSION

I. Standard of Review

In reviewing the ALJ's decision to deny Social Security disability benefits, the court does not determine *de novo* whether plaintiff is disabled, but sets aside the ALJ's decision only where it is based on legal error or is not supported by substantial evidence in considering the record

as a whole.  *Burgess v. Astrue*, 537 F.3d 117, 127-28 (2d Cir. 2008); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

    The reviewing court must be certain that the ALJ considered all the evidence when assessing the legal standards and evidentiary support used by the ALJ in his disability finding.  *See* 42 U.S.C. § 405(g) ("[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing.").  "[T]he ALJ, unlike a judge at trial, must himself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).

    The reviewing court is authorized to remand the Commissioner's decision to allow the ALJ to further develop

the record, make more specific findings, or clarify his

rationale. *See Grace v. Astrue,* No. 11-cv-9162, 2013 WL

4010271, at *14 (S.D.N.Y. July 1, 2013); *see also Butts v.*

*Barnhart,* 388 F.3d 377, 385-86 (2d Cir. 2004) ("where the

administrative record contains gaps, remand to the

Commissioner for further development of the evidence is

appropriate.").

II.   Legal Standards for Disability Claims

> A. *The Commissioner's Five-Step Analysis of Disability*
>    *Claims*

In order to receive disability benefits, a claimant

must become disabled while she still meets the insured state

requirements of the Society Security Act and the regulations

promulgated by the SSA. *Arone v. Bowen*, 882 F.2d 34, 37-38

(2d Cir. 1989). "Disability" is defined as the "inability to

engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment . . .

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a "five-step sequential

evaluation" to determine whether a claimant is disabled.  20

C.F.R. § 404.1520; *see Perez v. Chater*, 77 F.3d 41, 46 (2d.

Cir. 1996)(describing the five-step process).  If the

Commissioner can determine that a claimant is disabled or not

disabled at any step of the five-step sequence, the evaluation stops at that step and the Commissioner issues his decision; if a determination cannot be made at steps 1 through 4, the sequence continues to the next step. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful employment, he is not disabled "regardless of [his] medical condition." 20 C.F.R. § 404.1520(b). Otherwise, the Commissioner proceeds to step two, and determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairment is in fact medically severe, the sequence continues to step three, in which the Commissioner compares the claimant's impairment to a listing of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix I. § 404.1520(a)(4)(iii). If the claimant's impairment "meets or equals" one of the listed impairments, she is *per se* disabled irrespective of her "age, education, and work experience," and the sequential evaluation stops. 20 C.F.R. § 404.1520(d).

If the claimant is not *per se* disabled under step

three, the Commissioner must determine the claimant's
residual functional capacity ("RFC") before continuing to
step four.  20 C.F.R. § 404.1520(e).  RFC is defined as the
most the claimant can do in a work setting despite the
limitations imposed by her impairment.  20 C.F.R. §
404.1545(a)(1).  In determining the claimant's RFC, the
Commissioner should consider "all of the relevant medical
evidence," as well as descriptions and observations by non-
medical sources, such as the claimant's friends and family.
20 C.F.R. § 404.1545(a)(3).

After making the RFC determination, the Commissioner
will proceed to step four, at which point the Commissioner
must determine whether the claimant's RFC is sufficient to
perform her "past relevant work," which is defined as
substantial gainful activity that the claimant has done
within the past fifteen years.  20 C.F.R. §§
404.1520(a)(4)(iv), 404.1520(f), 404.1560(b)(1).  If the
claimant can perform her past relevant work, the claimant is
not disabled.  20 C.F.R. § 404.1520(f).  Otherwise, the
Commissioner must determine at step 5 whether the claimant
can make "an adjustment to other work."  20 C.F.R. §
404.1520(a)(4)(v).

In making the determination under step five, the
Commissioner must use her prior RFC finding in conjunction

with the claimant's "vocational factors" (*i.e.*, age, education, and work experience) to determine whether the claimant can transition to another job that is prevalent in the national economy. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c)(1). The Commissioner has a limited burden under step 5 to provide "evidence that demonstrates that other work exists in significant numbers in the national economy that" the claimant can do in light of her RFC and vocational factors. C.F.R. § 404.1560(c)(2). If the claimant cannot transition to another job prevalent in the national economy, the Commissioner must find the claimant disabled. *See* 20 C.F.R. § 404.1520(g)(1).

   B. *The Treating Physician Rule*

      "A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotation marks omitted). Nonetheless, the claimant's treating physician's opinion regarding the nature and severity of the claimant's impairment should be given controlling weight "so long as it is well-supported by medically acceptable . . . diagnostic techniques and it not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128; *see also* 20 C.F.R. § 404.1527(c)(2). The opinions of treating physicians are afforded controlling

weight because they are more likely to be "able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).

When the ALJ declines to give controlling weight to the treating physician's opinion in the disability decision, the ALJ shall consider the following six regulatory factors in determining how much weight to ultimately assign the treating physician's opinion:

> (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability [i.e., the degree of explanation given in the opinion]; (4) consistency [with the record as a whole]; (5) specialization; (6) other factors such as the treating physician's familiarity with disability programs and with the case record.

20 C.F.R. § 404.1527(c)(2)(i)-(ii); § 404.1527(c)(3)-(6).

## APPLICATION

I.  ALJ Penalver's May 25, 2012 decision

The court first summarizes ALJ Penalver's May 25, 2012 decision finding that plaintiff was not disabled, which became the final decision of the Commissioner on May 17, 2013. At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since August 16, 2007, the

application date, noting that although plaintiff has some
work activity, none of her jobs were performed at the
substantial gainful activity level. (Tr. 22.) At step two,
the ALJ found that plaintiff has the following severe
impairments: fibromyalgia, headaches, a lumbar disc bulge,
anxiety, and depression. (*Id*.) At step three, the ALJ found
that plaintiff does not have an impairment or combination of
impairments that meets or medically equals the severity of
the impairments found in 20 C.F.R. Part 404, Subpart P,
Appendix I. § 404.1520(a)(4)(iii). (*Id*.)

At step four, the ALJ found that plaintiff has the
RFC to perform the functional range of "light work" as
defined in 20 C.F.R. § 404.1567(b) with the following
limitations: plaintiff is limited to occasional pushing or
pulling with the bilateral upper extremities; plaintiff
cannot climb ladders, ropes or scaffolds; plaintiff is
limited to occasional climbing of ramps or stairs and
occasional stooping, crouching, kneeling and crawling; work
is limited to tasks consistent with semi-skilled jobs up to a
Specific Vocational Preparation ("SVP") of three and four;
and work is limited to a low stress job requiring only
occasional decision making. (Tr. 23.) The ALJ found the
plaintiff was not fully credible in light of the record,
specifically noting that plaintiff has not had any mental

health or neurological treatment since 2009 and 2007, respectively. (Tr. 25.) The ALJ gave little weight to Dr. Rao's opinion that plaintiff has marked limitations on the ground that the opinion is inconsistent with her GAF assessment of 58. (*Id.*) The ALJ gave little weight to the opinion of Dr. Elessawy that plaintiff was limited to less than sedentary work, because the assessment is at odds with Dr. Elessawy's "one time examination"[2] that plaintiff's only physical impairment was trigger points. (*Id.*) The ALJ also gave little weight to Dr. Desilva's December 11, 2007 psychological consultative examination, because his opinions were based on plaintiff's self-reporting. (*Id.*) Lastly, ALJ Penalver gave little weight to Dr. Misra's December 11, 2007 physical consultative examination because her only diagnosis had a question mark next to it. (*Id.*)

Under step five, the ALJ found that, considering plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that the claimant could perform, specifically as a collator operator, laundry sorter, or photocopy machine operator. (Tr. 26-27.)

---

[2] Dr. Elessawy has examined plaintiff on at least eight occasions prior to completing the fibromyalgia questionnaire.

## II.  Dr. Elessawy's opinion

Plaintiff contends that the ALJ erred by finding that plaintiff has the capacity for "light work," asserting that the ALJ improperly gave little weight to the opinion of Dr. Elessawy, a treating physician.  (Mem. of Law in Support of Pl.'s Cross-Mot. for J. on the Pleadings ("Pl.'s Mem.") at 19-21, ECF No. 22.)  Pursuant to 20 C.F.R. § 404.1567(b),

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

The court finds that the ALJ did not appropriately weigh the opinion of Dr. Elessawy, who treated plaintiff many times over a period of two years.  Dr. Elessawy opined that plaintiff could only sit for 20 minutes at a time and stand for 20 minutes at a time before needing to change positions. (Tr. 438-39.)  Dr. Elessawy also opined that plaintiff could only work for four hours a day and could only lift and carry less than ten pounds.  (*Id.*)  The parties do not dispute that Dr. Elessawy constitutes a treating physician pursuant to the

Commissioner's regulations. Plaintiff was referred by Dr. Chou to Dr. Elessawy for evaluation of her long-standing lower back pain, which had recently worsened. (Tr. 282, 527, 660; *see* Tr. 287-89, 564-65.) Plaintiff saw Dr. Elessawy at least eight times between August 2007 and June 2009, and Dr. Elessawy was managing plaintiff's treatment and physical therapy at that time. Thus, Dr. Elessawy was provided a detailed, longitudinal picture of plaintiff's fibromyalgia over the course of her treatment. *See* 20 C.F.R. § 404.1527(c)(2).

Upon a review of the entire record, the court also finds that Dr. Elessawy's opinion is consistent with the record as a whole. Dr. Flores, a consultative physician, also opined that plaintiff was limited for prolonged walking, sitting, standing, climbing stairs, and heavy lifting. (Tr. 409.) Dr. Misra opined that plaintiff could only perform work that does not involve lifting too much weight. (Tr. 431-32.)

The ALJ's reason for giving little weight to Dr. Elessawy's opinion was that Dr. Elessawy's opinion was not supported by his "one time examination" finding that plaintiff's only physical impairment was trigger points. As an initial matter, the ALJ misrepresented the record; Dr. Elessawy examined plaintiff at least eight times over the

course of approximately two years.  Secondly, the ALJ has
pointed to no medical opinion that trigger points in the
shoulders, upper back, both elbows, knees, and hips due to
fibromyalgia are inconsistent with the limitations that Dr.
Elessawy found.  The ALJ is "not permitted to substitute his
own expertise or view of the medical proof for the treating
physician's opinion or for any competent medical opinion."
*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).  Here, the
ALJ has improperly substituted his own view of the medical
proof by giving little weight to Dr. Elessawy's opinion.
Consequently, the court finds that there is not substantial
evidence on the record to support a finding that plaintiff
can do "light work" and remands this case for the ALJ to
determine whether plaintiff can perform sedentary work
pursuant to 20 C.F.R. § 404.1567(a).

III. Limitations of reaching and handling

        Plaintiff also contends that the ALJ's finding that
Ms. Rivers is capable of the reaching, handling, and
fingering required to do the jobs identified by the
vocational expert is not supported by substantial evidence.
(Pl.'s Mem. at 21.)  ALJ Penalver found that plaintiff is
limited to only occasional pushing or pulling with the
bilateral upper extremities, but makes no mention of any
limitations with respect to reaching, handling, or fingering.

(Tr. 23.)

On October 29, 2009, Dr. Elessawy opined that
plaintiff had significant limitations in doing repetitive
reaching, handling, or fingering. (Tr. 440.) Dr. Elessawy
also opined that plaintiff could perform activities requiring
use of her arms and gross and fine manipulation with her
hands and fingers 50% of an eight-hour day. (*Id*.) The
record contains no other medical opinions as to plaintiff's
limitations with respect to her ability to reach, handle, and
finger.

In light of the fact that the record contains no
medical opinion to the contrary and for substantially the
same reasons stated above, the court finds that the ALJ erred
by giving little weight Dr. Elessawy's opinion that plaintiff
was significantly limited in doing repetitive reaching,
handling, or fingering. In light of the fact that the jobs
recommended by the vocational expert all require frequent
reaching and handling[3], the court remands this case for the

---

[3] Pursuant to the testimony of the vocational expert, ALJ Penalver found
that plaintiff is able to the following jobs: collator operator (DOT
Code 208.685-010), laundry sorter (DOT Code 361.687-014), and photocopy
machine operator (DOT Code 207.685-014). According to the Revised
Dictionary of Occupational Titles ("DOT") Selected Characteristics of
Occupations ("SCO"), the job of a collator operator requires frequent
reaching, frequent handling, and frequent fingering; the job of a
laundry sorter requires frequent reaching, frequent handling, and
occasional fingering; and the job of photocopy machine operator
requires frequent reaching, frequent handling, and frequent fingering.
(*See* Pl.'s Mem. Exh. A; *see also* United States Department of Labor,
Selected Characteristics of Occupations Defined in the Revised

ALJ to consider whether there are jobs that exist in significant numbers in the national economy consistent with plaintiff's limitations with reaching, handling, and fingering.

IV.  Plaintiff's psychological limitations

Plaintiff contends that her depression and anxiety preclude the ability to engage in any substantial gainful activity. (Pl.'s Mem. at 23.) Plaintiff asserts that the ALJ erred by giving little weight to Dr. Rao's opinion that plaintiff had marked difficulties with activities of daily living and social functioning, because the ALJ misunderstood the meaning of plaintiff's GAF score. (*Id.*)

The court finds that there is substantial evidence in the record to support the ALJ's determination that plaintiff's anxiety and depression were not disabling.  Dr. Desilva's December 11, 2007 examination found that plaintiff's abstract thinking was concrete, her intellectual functioning was average, and her insight and judgment were fair. (Tr. 336.)  Dr. Havill's July 18, 2008 examination found that plaintiff had good eye contact, speech was normal, thought process was coherent and goal oriented, cognition and memory were good, no abnormal movements were detected, and

Dictionary of Occupational Titles, ("Selected Characteristics of Occupations"), at 134, 203, available at http://onlineresources.wnylc.net/docs/SelectedCharacteristicsSearch121110.pdf.)

insight and judgment were fair.  (Tr. 473.)  Dr. Idupuganti's
August 22, 2008 noted that plaintiff reported that she reads
and takes care of her children's needs and is able to cook,
clean, and shop by herself.  (Tr. 400.)  Dr. Idupuganti's
mental status examination found that plaintiff presented as
pleasant and cooperative and answered questions openly and
willingly, although she was anxious and tearful at times.
(Tr. 401.)  Dr. Idupuganti found that plaintiff's attention,
concentration, and social judgment skills were within normal
limits, and that plaintiff had average intellectual skills.
(Tr. 401.)  Dr. Gagan's consultative examination on August 29,
2008 found that plaintiff had mild restrictions maintaining
social functioning and moderate restrictions of activities of
daily living and maintaining concentration, persistence, or
pace.  (Tr. 421.)  Consequently, the court finds that Dr.
Rao's opinion finding marked limitations in activities of
daily living and social functioning is not consistent with
the remainder of the medical record and finds that the ALJ
properly gave his opinion little weight.  *See* 20 C.F.R. §
404.1527(c)(2); *Burgess*, 537 F.3d at 128.

## CONCLUSION

For the foregoing reasons, the court denies the
Commissioner's and plaintiff's motions for judgment on the

pleadings and remands this case for further proceedings consistent with this opinion. Specifically, the ALJ should:

1) Reconsider plaintiff's residual functional capacity in light of the fact that substantial evidence in the record demonstrates that plaintiff is unable to perform "light work."

2) Reconsider whether there are jobs that exist in significant numbers in the national economy consistent with plaintiff's limitations with reaching, handling, and fingering.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**


Dated:      April 1, 2016
            Brooklyn, New York


                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge